UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

SAMUEL SERRANO,

                    Defendant.

————————————————————

SAMUEL SERRANO,

                    Petitioner

-v.-

UNITED STATES OF AMERICA,

                    Respondent

15 Cr. 608-4 (KPF)

**OPINION AND ORDER**

20 Civ. 9887 (KPF)

KATHERINE POLK FAILLA, District Judge:

Samuel Serrano, who is presently housed at the Federal Correctional Institution at Ray Brook, New York ("FCI Ray Brook"), was sentenced by this Court on racketeering and firearms charges to an aggregate term of 138 months' imprisonment in January 2017. Mr. Serrano did not appeal from his conviction or sentence, but later filed a *pro se* motion for resentencing that this Court denied as untimely in July 2018. Thereafter, with the assistance of counsel, Mr. Serrano filed (i) a motion pursuant to 28 U.S.C. § 2255 seeking vacatur of one of his counts of conviction and resentencing, and (ii) a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). For the reasons set forth in the remainder of this Opinion, this Court denies Mr.

Serrano's Section 2255 motion and grants in part his Section 3582(c)(1)(A)(i)
motion.

## BACKGROUND[1]

### A.      The Charging Instruments and the Guilty Plea

Indictment 15 Cr. 608 (KPF) (the "Indictment") was filed under seal on
September 3, 2015, and unsealed six days later.  (Dkt. #1, 2).  Broadly
speaking, the Indictment detailed criminal activities undertaken by the Taylor
Avenue Crew (or the "Crew"), described as a "criminal organization whose
members and associates engaged in, among other activities, narcotics
trafficking, attempted murder, and murder" (Dkt. #1 at ¶ 1), while embroiled in
a violent, years-long dispute with the rival Leland Avenue Crew (*see, e.g.*, *id.* at
¶¶ 1-9).  Mr. Serrano was charged in three of the eight counts of the Indictment
with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One);
narcotics conspiracy, in violation of 21 U.S.C. § 846 (Count Five); and the use,
carrying, and discharge of a firearm during and in relation to, and possession
in furtherance of, the racketeering conspiracy charged in Count One, in
violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2 (Count Seven).

Superseding Indictment S3 15 Cr. 608 (KPF) was filed on April 15, 2016.
(Dkt. #73).  Mr. Serrano was again charged with racketeering conspiracy
(Count One) and narcotics conspiracy (Count Eight), but this time the firearms
count was modified to charge him with the use, carrying, and discharge of a

---

[1]      Except where otherwise indicated, the Court cites to the parties' submissions by their
docket entry number and will use the page numbers assigned by this Court's electronic
case filing ("ECF") system.  "Dkt." refers to the docket in Mr. Serrano's criminal case.

firearm during and in relation to, and possession in furtherance of, the racketeering conspiracy charged in Count One and the narcotics conspiracy charged in Count Eight (Count Fifteen).  (*Id.*).

Mr. Serrano pleaded guilty to Counts One and Fifteen of the S3 Indictment on July 28, 2016.  (Dkt. #121 (plea transcript)).  He did so pursuant to a written plea agreement with the Government (the "Plea Agreement" (Dkt. #472-1 at 30-37)) that made clear, among other things, that (i) his plea to Count Fifteen was to the lesser-included offense of using, carrying, or possessing a firearm, but not discharging it; and (ii) Mr. Serrano's use, carrying, or possession of a firearm was in relation to *both* a crime of violence (the Count One racketeering conspiracy) and a qualifying narcotics trafficking offense (the Count Eight narcotics conspiracy).  (*Id.* at 30, 31).  Also in the Plea Agreement, the parties stipulated to a range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") of 168 to 195 months' imprisonment, which included a mandatory minimum term under Count Fifteen of 60 months' imprisonment that was to be imposed consecutive to any term of imprisonment imposed on Count One.  (*Id.* at 34).

During Mr. Serrano's plea allocution, the Court discussed with him the offenses to which he proposed to plead guilty, *viz.*, Counts One and Fifteen, and had the prosecutor outline the elements of each offense.  With particular respect to Count Fifteen, the prosecutor explained as follows:

> Then with respect to Count 15, the elements are, first, that the defendant committed a crime for which he might be prosecuted in a court of the United States,

> *here, narcotics trafficking and the racketeering conspiracy*; second, that the defendant knowingly used or carried or possessed a firearm during and in relation to or in furtherance of these crimes, or aided and abetted others in doing the same.

(Dkt. #121 at 14-15 (emphasis added)).  Later in the proceeding, the Court directed Mr. Serrano's attention to the specific paragraph of the Plea Agreement that discussed the lesser-included offense of Count Fifteen to which he proposed to plead guilty; that paragraph also referenced both the racketeering and narcotics trafficking conspiracies.  (*Id.* at 22-23).  And the Court reviewed with Mr. Serrano his waiver of his right to appeal and to collaterally challenge certain components of his sentence, including any sentence of imprisonment within or below the stipulated Guidelines range of 168 to 195 months' imprisonment.  (*Id.* at 25).

When asked by the Court to explain what he had done that made him believe that he was guilty of the offenses charged in Counts One and Fifteen of the S3 Indictment, Mr. Serrano began as follows:

> From in or around 2012 through September, 2015, in the Southern District of New York, I was a member of Taylor Ave Gang.  When I was a member, I agreed to with others to participate in activities, including possession of a firearm and drug dealing crack cocaine.  On March 4[, 2012], I participated in a shooting in the Bronx.  I fired a gun through an apartment building.

(Dkt. #121 at 27).  The Court then asked several clarifying questions concerning Mr. Serrano's conduct, which prompted the following exchange:

> THE COURT: So Taylor as an organization engaged in narcotics trafficking, among other things; is that correct?

4

THE DEFENDANT: Yes.

THE COURT: And they sold crack cocaine?

THE DEFENDANT: Yes.

THE COURT: And they sold it in the Bronx?

THE DEFENDANT: Yes.

THE COURT: In addition, in order to protect their territory or to aid them in continuing their operations, Taylor also had people in the organization use guns, correct?

THE DEFENDANT: Yes.

THE COURT: So is it fair to say that there were threats of violence or actual violence in order to protect or preserve the Taylor Avenue Crew?

THE DEFENDANT: Yes.

THE COURT: In part, that was because there were rivalries with other groups, such as the Leland Avenue Crew; is that fair to say, as well, sir?

THE DEFENDANT: Yes.

THE COURT: So you told me a few moments ago that you agreed with others [in] Taylor to do things. So what you did as part of your agreement was to sell crack cocaine?

THE DEFENDANT: Yes.

THE COURT: Did you also agree to use or carry or possess a gun in connection with Taylor's activities?

THE DEFENDANT: Yes.

THE COURT: Separately, you mentioned that in connection with these activities, you once, in March of 2012, fired a gun through a door; is that correct?

THE DEFENDANT: Yes.

> THE COURT: Working backwards, sir. When you agreed with others in Taylor to engage in these activities, did you know that what you were doing was wrong and illegal?
>
> THE DEFENDANT: Yes, I did.
>
> THE COURT: And when you possessed the gun in connection with these activities, and when you fired the gun, did you also know that what you were doing was wrong and illegal?
>
> THE DEFENDANT: Yes.

(*Id.* at 28-29).[2]

The Court also asked the Government to outline the evidence that it would introduce if Mr. Serrano were to proceed to trial, which included

> rap videos from YouTube that involved the defendant and other members of the Taylor Avenue Crew displaying gang signs and rapping about shootings and dealing drugs, multiple cooperating witnesses who would testify that the defendant sold crack cocaine on Taylor Avenue for the Taylor Avenue Crew as far back as 2012 and in the 2014 to 2015 time period, testimony from NYPD officers regarding the defendant's prior arrests during the conspiracy period for crack sales and crack cocaine possession, and also cooperating witnesses, law enforcement testimony, and video regarding the March, 2012 shooting.

(Dkt. #121 at 32-33).  Mr. Serrano acknowledged listening to this recitation of evidence.  (*Id.* at 33).  At the conclusion of the proceeding, the Court accepted Mr. Serrano's guilty plea.  (*Id.* at 34).

---

[2]    Counsel for Mr. Serrano also indicated that the defense did not dispute that "the particular activities of this gang involving, as they did, narcotics that were not grown in New York State, or guns that are not manufactured in New York State, that they implicated interstate commerce."  (Dkt. #121 at 30).

B.     **The Sentencing**

The Probation Office prepared a Presentence Investigation Report in anticipation of Mr. Serrano's sentencing.  (Dkt. #142 (Final Presentence Investigation Report ("PSR"))).  After discussing at some length the rivalry between the Taylor and Leland Avenue Crews, and the escalating acts of violence that marked that rivalry, the PSR addressed the roles of each of the defendants charged in the instant case.  (PSR ¶¶ 38-64).  Mr. Serrano was described as (i) a "Taylor Avenue Crew member who personally distributed crack cocaine on Taylor Avenue," (ii) who "carried guns in connection with his membership in the Taylor Avenue Crew," (iii) who once "brandished a firearm to threaten an individual with whom members of the Taylor Avenue Crew had a dispute," and (iv) who attempted to kill a member of the Leland Avenue Crew by firing two shots into an apartment where he believed the Leland member was staying.  (*Id.* at ¶¶ 47-48).[3]

In his sentencing submission, Mr. Serrano acknowledged that "[h]e was involved with a gang that engaged in violence and drug-dealing."  (Dkt. #176 at 9; *see also id.* at 10 ("[Mr. Serrano's] role in drug-dealing was limited to street-level sales, as opposed to high-volume  trafficking.")).  The Government, in its sentencing submission, reiterated that the firearms charge in Count Fifteen pertained to both the racketeering conspiracy charged in Count One and the

---

[3]     The original Guidelines calculations in the PSR were incorrect, as the parties acknowledged.  (Dkt. #191 at 4-5).  The Court ultimately calculated the Guidelines in a manner that replicated the parties' stipulated Guidelines range of 168 to 195 months' imprisonment.  (*Id.* at 31-32).

narcotics conspiracy charged in Count Eight, and that Mr. Serrano's

acknowledged discharge of a firearm could, absent the parties' Plea Agreement

to a lesser-included offense, have resulted in a ten-year mandatory consecutive

term. (Dkt. #179 at 2, 4). The Government further noted that

> Serrano was not simply a drug dealer. As a member of
> the Taylor Avenue Crew, he showed a willingness to
> protect the Crew's drug territory with the most serious
> forms of violence involving firearms. At least twice, the
> defendant resorted to using firearms to enforce the
> Crew's control over its territory, brandishing the firearm
> on one occasion and firing it on another. On the later
> occasion, Serrano attempted to murder a rival gang
> member, and because he fired into the wrong apartment
> door, very easily could have killed an innocent
> bystander. Serrano also boasted online about
> committing acts of violence.

(*Id.* at 6).

Sentencing in the matter took place on January 20, 2017. (Dkt. #191

(sentencing transcript); *see also* Dkt. #184 (judgment)). After ensuring that it

had all of the relevant sentencing materials, the Court confirmed with counsel

for Mr. Serrano that the defense had no objections to the PSR and its factual

statements, including the passages cited above. (Dkt. #191 at 3-4). The Court

then engaged in a wide-ranging colloquy with both sides that covered, among

other issues, Guidelines calculation errors in the PSR; the possibility of credit

for prior sentences served; Mr. Serrano's involvement in drug-dealing and

firearms offenses as a member of the Crew; and his efforts at rehabilitation and

plans for reentry. (*Id.* at 4-29). After hearing from Mr. Serrano himself and

taking a recess to consider the parties' arguments, the Court imposed a

substantially-below-Guidelines sentence, reasoning as follows:

No one disputes that [Mr. Serrano's] childhood was not what we would want it to be, and it is unfortunate that it led him to the acts that bring him here today. The concern that I have with the recommendations of the probation office and of the defense is that I think it very much understates what happened in the RICO conspiracy. I do understand the need for family, the need to belong, but it does not justify what I think Mr. Serrano participated in, which is effectively terrorizing the residents of this very small area, be it in drug dealing or in violent conflicts with another gang.

I also cannot look past the use of a firearm. It's unfortunate he had it. It's unfortunate he brandished it. It's unfortunate that he shot at someone else's door. I am less sanguine, I am less willing to give him a break, as it were, because he didn't hit anyone. There is something to be said for that, but it wasn't for lack of trying, and that does really concern me.

I also note, because I do note it, that there has been a not great adjustment to incarceration. There are infractions here and while in the custody of the New York City Department of Corrections. I think the criminal history category is the proper one. The convictions that he has previously are small in scale, but there are a number of them.

*** 

I have also considered the possibility of sentence disparity. I have sentenced others in this case, including Mr. Otero, and I need to ensure that the sentence I impose reflects accurately how these two men are similar and are different.

So I am willing to go down 30 months, but I am not willing to go down to the level sought by the defense, because, again, I think what happened was just too, too severe, and to do that would basically give a package deal or a volume discount to the RICO conspiracy that I think is inappropriate on these facts.

So it will be a 78-month term of imprisonment on Count One and a 60-month term of imprisonment on Count Fifteen. This aggregate term of imprisonment will be

> followed by concurrent terms of three years' supervised
> release, with the mandatory, standard and special
> conditions that we discussed earlier.   I will not impose
> a fine or restitution or forfeiture.   I am required to
> impose a $100 special assessment on each count of
> conviction, and so that would be $200 in this case.

(*Id.* at 33-34).[4]

## C.       The Post-Conviction Motion Practice

Mr. Serrano did not appeal from his conviction and sentence.  In August

2017, Mr. Serrano sought reappointment of his defense counsel to assist with a

collateral challenge motion based on the Supreme Court decision in *United*

*States* v. *Dean*, — U.S. —, 137 S. Ct. 1170 (2017), in which the Court held that

a sentencing court was not precluded from considering the mandatory

minimum term specified by Section 924(c) when calculating an appropriate

sentence for the predicate offense.  (Dkt. #231).  The Court denied the request,

observing, among other things, that (i) the issues raised by Mr. Serrano were

straightforward and required neither discovery nor an evidentiary hearing and

(ii) "any expansion of the Court's discretion occasioned by the *Dean* decision

would not have caused the Court then, and does not cause it now, to revisit the

sentence it imposed."  (Dkt. #234).

In July 2018, Mr. Serrano asked the Court to resentence him in light of

the Supreme Court's decision in *Sessions* v. *Dimaya*, — U.S. —, 138 S. Ct.

1204 (2018), which had concluded that the definition of "crime of violence" in

---

[4]        As Mr. Serrano noted (*see* Dkt. #472 at 7), the judgment defines the "nature of offense"
of Count Fifteen as "[u]sing firearms during crime of violence," omitting the narcotics
conspiracy object.  That is a clerical error that this Court will correct pursuant to
Federal Rule of Criminal Procedure 36.

18 U.S.C. § 16(b), as incorporated into the Immigration and Nationality Act's definition of "aggravated felony," was unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause. The Court construed the request, for purposes of its analysis, as a Section 2255 motion, but denied it as untimely because more than one year had passed since Mr. Serrano's conviction had become final and the Supreme Court had not found the *Dimaya* decision to apply retroactively. (Dkt. #244).[5]

In March 2019, Mr. Serrano again requested the appointment of counsel to assist with a request for resentencing in light of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, and the aforementioned *Dimaya* decision. (Dkt. #308). Again the Court denied his request, noting as before that the legal issues were straightforward and required neither discovery nor an evidentiary hearing. (Dkt. #310).[6]

---

[5]     While specifically referencing *Adams* v. *United States*, 155 F.3d 582 (2d Cir. 1998), the Court inadvertently overlooked that case's directive to obtain the informed consent of Mr. Serrano before recharacterizing his request for resentencing as a Section 2255 motion. For this reason, the request does not count for purposes of determining whether the instant motion is "second or successive" under 28 U.S.C. § 2255(h). *See Castro* v. *United States*, 540 U.S. 375, 383 (2003) ("In such circumstances the district court must notify the *pro se* litigant that it intends to recharacterize the pleading, warn the litigant that this recharacterization means that any subsequent § 2255 motion will be subject to the restrictions on 'second or successive' motions, and provide the litigant an opportunity to withdraw the motion or to amend it so that it contains all the § 2255 claims he believes he has. If the court fails to do so, the motion cannot be considered to have become a § 2255 motion for purposes of applying to later motions the law's 'second or successive' restrictions.").

[6]     In responding to Mr. Serrano's first two requests for counsel, the Court referred him to then-binding Second Circuit precedent concerning what racketeering activity sufficed to render RICO violations qualifying offenses under 18 U.S.C. § 924(c). This precedent would subsequently be abrogated by the Supreme Court's *Davis* decision, discussed later in this Opinion.

In July 2020, Mr. Serrano again requested the appointment of counsel to assist with a request for resentencing.  (Dkt. #432).  In response to a Court request for clarification (*see id.*), Mr. Serrano explained that he sought vacatur of his conviction on Count Fifteen for violation of Section 924(c) in light of the Supreme Court's decision in *United States* v. *Davis*, — U.S. —, 139 S. Ct. 2319 (2019), which concluded that the residual definition of "crime of violence" in 18 U.S.C. § 924(c)(3)(B) was unconstitutionally vague (Dkt. #461).  The Court granted Mr. Serrano's request (Dkt. #460), and appointed Georgia J. Hinde from the Court's Criminal Justice Act panel to represent him (Dkt. #460-463).[7]

Mr. Serrano filed his counseled Section 2255 motion on November 20, 2020.  (Dkt. #472).  The Government responded on December 5, 2020 (Dkt. #481), and Mr. Serrano filed a counseled reply on December 18, 2020 (Dkt. #483).  In April 2021, Mr. Serrano filed a counseled motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  (Dkt. #508).  The Government opposed the motion by letter brief dated May 13, 2021.  (Dkt. #519).  Mr. Serrano filed a counseled reply submission on May 27, 2021 (Dkt. #524), and several supplemental submissions thereafter (Dkt. #533, 590).  The parties also filed supplemental submissions in response to a Court order inviting same issued on April 12, 2022.  (Dkt. #605, 607, 608, 609).  The Court will first consider Mr. Serrano's Section 2255 motion, and then consider his later-filed motion for compassionate release.

---

[7]   The Court extends its appreciation to Ms. Hinde for her thoughtful submissions in this case.

## DISCUSSION

**A.      The Court Denies Mr. Serrano's Section 2255 Motion**

**1.      Applicable Law**

**a.      Motions Under 28 U.S.C. § 2255**[8]

A prisoner in federal custody may seek to have his sentence vacated, set aside, or corrected on the grounds that it "was imposed in violation of the Constitution or laws of the United States, or that the [trial] court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack[.]"  28 U.S.C. § 2255(a).  However, the grounds for such a collateral attack under Section 2255 are much more limited than those available on a direct appeal. *See United States* v. *Addonizio*, 442 U.S. 178, 185 (1979).  Relief may lie "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  *United States* v. *Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill* v. *United States*, 368 U.S. 424, 428 (1962)).

A federal prisoner seeking relief under Section 2255 must generally file a motion within one year from the latest of four benchmark dates, that is, from the date when: (i) the judgment of conviction becomes final; (ii) a government-created impediment to making such a motion is removed; (iii) the right asserted is initially recognized by the Supreme Court, if it has been made retroactively

---

[8]      Caselaw in this area uses the terms "movant," "petitioner," and "defendant" interchangeably.

available to cases on collateral review; or (iv) the facts supporting the claim(s) could have been discovered through the exercise of due diligence. See 28 U.S.C. § 2255(f).

"[A] § 2255 petition cannot be used to 'relitigate questions which were raised and considered on direct appeal.'" *United States* v. *Sanin*, 252 F.3d 79, 83 (2d Cir. 2001) (quoting *Cabrera* v. *United States*, 972 F.2d 23, 25 (2d Cir. 1992)). What is more, Section 2255 cannot be used to bring claims for the first time that could have been raised on direct appeal. *See Bousley* v. *United States*, 523 U.S. 614, 622-23 (1998). Where the petitioner has procedurally defaulted on a claim by failing to raise it on direct appeal, the claim may be raised pursuant to Section 2255 only if the petitioner can demonstrate (i) cause for the failure to raise the claim and prejudice from the alleged error, or (ii) actual innocence of the crime. *Id.*

Cause can be established by showing that the default was the result of "some objective factor external to the defense." *Murray* v. *Carrier*, 477 U.S. 478, 488 (1986). For example, where a claim "is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim." *United States* v. *Whitman*, 115 F. Supp. 3d 439, 443 (S.D.N.Y. 2015) (quoting *Reed* v. *Ross*, 468 U.S. 1, 16 (1984)) (internal quotation marks omitted). "[A] claim is not reasonably available when, at the time of the procedural default, binding precedent foreclosed the argument or when the defendant lacked the relevant tools with which to raise his claim on direct appeal." *Id.* (citations and internal quotation marks omitted). To demonstrate

14

prejudice, the petitioner must show "not just that the errors 'created a possibility of prejudice, but that they worked to his actual and substantial disadvantage.'" *Borrego* v. *United States*, 975 F. Supp. 520, 522 (S.D.N.Y. 1997) (quoting *United States* v. *Frady*, 456 U.S. 152, 170 (1982)).  In the context of a guilty plea, a petitioner "must show that there is a reasonable probability that, but for [the] errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill* v. *Lockhart*, 474 U.S. 52, 59 (1985) (discussing prejudice in the context of an ineffective assistance of counsel claim); *see also Strickler* v. *Greene*, 527 U.S. 263, 296 (1999) (finding no prejudice from procedural default since "petitioner has not shown that there is a reasonable probability that his conviction or sentence would have been different").

Alternatively, the petitioner may show that the federal court's refusal to consider the merits of his claim will result in a fundamental miscarriage of justice, because he is "actually innocent" of the crimes for which he was convicted.  *Aparicio* v. *Artuz*, 269 F.3d 78, 90 (2d Cir. 2001).  A court may find that a petitioner is actually innocent only when, after reviewing all of the evidence, it concludes that "no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Doe* v. *Menefee*, 391 F.3d 147, 162 (2d Cir. 2004) (internal quotation marks omitted).

### b.    18 U.S.C. § 924(c)

Title 18, United States Code, Section 924(c)(1)(A) prohibits "during and in relation to any crime of violence or drug trafficking crime ... us[ing] or

carr[ying] ... or ... possess[ing] a firearm." Section 924(c)(2) defines a "drug trafficking crime" to include "any felony punishable under the Controlled Substances Act ..., the Controlled Substances Import and Export Act ..., or chapter 705 of title 46." Section 924(c)(3) defines a "crime of violence" as "an offense that is a felony" and:

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

The first subpart of Section 924(c)(3) is commonly called the "elements clause," and the second subpart is commonly called the "residual clause." *Davis*, 139 S. Ct. at 2324.

The residual clause contained in Section 924(c) and other statutes has been extensively litigated. *See Jackson* v. *United States*, No. 16 Civ. 4792 (LAP), 2022 WL 976358, at *4 (S.D.N.Y. Mar. 31, 2022) (discussing evolution of the definition of "crime of violence"). In 2015, the Supreme Court struck down a similar residual clause in the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B), reasoning that the residual clause was unconstitutionally vague. *See Johnson* v. *United States*, 576 U.S. 591 (2015). Three years later, the Court invalidated the residual clause of the INA, 18 U.S.C. § 16. *See Sessions* v. *Dimaya*, 138 S. Ct. at 1215-16. The following year, the Court applied *Johnson* to strike down the residual clause of Section 924(c)(3) as unconstitutionally vague as well. *Davis*, 139 S. Ct. at 2323-24.

16

After *Davis*, the predicate crime of violence required to sustain a conviction under Section 924(c) must be a crime of violence as defined by the elements clause. Generally speaking, conspiracy offenses do not meet this definition. *See, e.g.*, *United States* v. *McCoy*, 995 F.3d 32, 52 (2d Cir. 2021). More specifically, the Second Circuit has found that RICO conspiracy is not a crime of violence under Section 924(c)(3). *See United States* v. *Capers*, 20 F.4th 105, 120 (2d Cir. 2021) ("In sum, it cannot be the case that RICO conspiracy categorically 'has as an element the use, attempted use, or threatened use of physical force against the person or property of another.' 18 U.S.C. § 924(c)(3)(A). Thus, RICO conspiracy is not a crime of violence."); *see also United States* v. *Martinez*, 991 F.3d 347, 354 (2d Cir. 2021) ("We can assume that the [RICO] conspiracy violation is not a crime of violence under the force clause because, as the Supreme Court's decision in *Davis* reasoned, a conspiracy offense cannot categorically involve the use of force, since its key element is simply an agreement to commit a crime." (citing *Davis*, 139 S. Ct. at 2325, and *United States* v. *Barrett*, 937 F.3d 126, 127 (2d Cir. 2019))). Of note, however, Section 924(c) convictions predicated on a narcotics trafficking offense are unaffected by *Davis*. *See, e.g.*, *United States* v. *Kilpatrick*, No. 15-3012-cr, 2021 WL 3354737, at *4-5 (2d Cir. Aug. 3, 2021), *cert. denied sub nom. Taylor* v. *United States*, 142 S. Ct. 502 (2021); *United States* v. *Dussard*, 967 F.3d 149, 156 (2d Cir. 2020); *see generally McKnight* v. *United States*, No. 15 Cr. 607 (JPC), 2021 WL 5647792, at *4 (S.D.N.Y. Dec. 1, 2021).

###   2.    Analysis

####       a.    The Court Will Not Enforce Mr. Serrano's Appellate Waiver

Though the Government does not raise this argument, the waiver provision of Mr. Serrano's Plea Agreement seemingly bars him from bringing this motion.  It is settled law that "[a] defendant's knowing and voluntary waiver of the right to appeal or collaterally attack his conviction and/or sentence is enforceable."  *Sanford* v. *United States*, 841 F.3d 578, 580 (2d Cir. 2016) (collecting cases).  More to the point, Second Circuit precedent "foreclose[s] the possibility that a plea agreement can be nullified by a change in law *after* the agreement is executed."  *Unites States* v. *Riggi*, 649 F.3d 143, 149 n.7 (2d Cir. 2011); *see also Sanford*, 841 F.3d at 580 ("[A] defendant's inability to foresee [a change in the law] does not supply a basis for failing to enforce an appeal waiver." (internal quotation marks omitted)); *see also United States* v. *Santiago*, 806 F. App'x 32, 34 (2d Cir. 2020) (summary order) (rejecting argument that appeal waiver in plea agreement was nullified by subsequent change in law reflected in *Davis*); *accord United States* v. *Crews*, No. 20-3820, 2022 WL 777684, at *3 (2d Cir. Mar. 15, 2022); *United States* v. *Borden*, 16 F.4th 351, 353-56 (2d Cir. 2021).

As noted, Mr. Serrano pleaded guilty pursuant to a written Plea Agreement in which he waived certain rights and agreed "not [to] file a direct appeal; nor bring a collateral challenge, including but not limited to an application under Title 28, United States Code, Section 2255 and/or Section 2241; nor seek a sentence modification pursuant to Title 18, United States

Code, Section 3582(c), of any sentence within or below the Stipulated Guidelines Range of 168 to 195 months' imprisonment." (Dkt. #472-1 at 35). During the plea proceeding, the Court drew Mr. Serrano's attention to the waiver paragraph of the Plea Agreement, and confirmed his waiver of his right to "to appeal or otherwise challenge any term of imprisonment that is 195 months or less." (Dkt. #121 at 25). *See* Fed. R. Crim. P. 11(b)(1)(N) ("During [the plea colloquy], the court must inform the defendant of, and determine that the defendant understands, the following: … (N) the terms of any plea-agreement provision waiving the right to appeal or to collaterally attack the sentence[.]"); *see also United States* v. *Salmonson*, 759 F. App'x 106, 108 (2d Cir. 2019) (summary order) (finding appellate waiver to have been knowingly and voluntarily made, and thus enforceable). On the theory that the Government's failure to raise the provision in its opposition papers has "waived the waiver," as it were, the Court will continue with its analysis. *See generally United States* v. *Quiroz*, 22 F.3d 489, 491 (2d Cir. 1994) (discussing circumstances in which Government failure to raise argument amounts to waiver of otherwise applicable waiver).

### b. The Government Has Waived Any Claim of Procedural Bar

Because Mr. Serrano did not raise his *Davis* argument on direct appeal, the Court next considers whether he has procedurally defaulted on the claim. On this point, Mr. Serrano makes no arguments concerning cause and

prejudice excusing his failure to raise the issue earlier.[9]  Instead, Mr. Serrano suggests that his motion is timely because it was filed within one year of the *Davis* decision, and because *Davis* should be given retroactive effect.  (*See* Dkt. #472 at 9 n.1).  However, while the *Johnson* case on which *Davis* is based has been found by the Supreme Court to apply retroactively to cases on collateral review, *see Welch* v. *United States*, 578 U.S. 120, 130 (2016), neither the Supreme Court nor the Second Circuit has found *Davis* itself to have retroactive effect.  *See, e.g.*, *United States* v. *Vallejo*, No. 16 Cr. 108 (ALC), 2022 WL 313873, at *1 (S.D.N.Y. Feb. 2, 2022) ("The government has also correctly stated that there is no controlling authority from the Second Circuit or the Supreme Court on retroactive application of the *Davis* rule for purposes of review under Section 2255."); *Caraballo* v. *United States*, No. 10 Cr. 392 (CS), 2021 WL 1062036, at *1 (S.D.N.Y. Mar. 19, 2021) ("The Second Circuit has not decided whether *Davis* is retroactively available on collateral review."); *cf.* *Knowles* v. *United States*, No. 11 Cr. 630 (KMK), 2022 WL 999078, at *19 (S.D.N.Y. Mar. 30, 2022) ("The Supreme Court, in the wake of *Johnson*, applied

---

[9]    Courts undertaking a cause and prejudice analysis in light of *Davis* have come to different conclusions.  *Compare, e.g.*, *Lopez* v. *United States*, No. 16 Cr. 719-3 (RJS), 2022 WL 912698, at *4 (S.D.N.Y. Mar. 29, 2022) (finding neither cause nor prejudice where conviction became final in 2018 and where record, including plea allocution, identified narcotics trafficking as an alternate predicate), *with Jackson* v. *United States*, No. 16 Civ. 4792 (LAP), 2022 WL 976358, at *6-7 (S.D.N.Y. Mar. 31, 2022) (finding cause, but no prejudice, where movant's conviction became final in 1999, and where review of the record disclosed evidence sufficient to support a substantive murder conviction, and thus "no reasonable probability that Mr. Jackson would not have pled guilty to the § 924(c) counts"), *and Speed* v. *United States*, No. 16 Civ. 4500 (PKC), 2020 WL 7028814, at *3-4 (S.D.N.Y. Nov. 30, 2020) (finding cause and prejudice, but denying *Davis* claim on the merits, where record supported substantive racketeering charge as alternate predicate).

the same logic in *Davis*, holding the residual clause in § 924(c)(3)(B) void for vagueness. *See Davis*, 139 S. Ct. at 2336. It follows, then, that *Davis* also announced a new substantive criminal rule that has retroactive effect on collateral review."); *Savoca* v. *United States*, No. 03 Cr. 841-01 (VB), 2020 WL 2133187, at *6 (S.D.N.Y. May 5, 2020) ("[T]he parties agree *Davis* applies retroactively to cases on collateral review under *Welch*."), *aff'd*, 21 F.4th 225 (2d Cir. 2021).

Again, however, the Court's analysis is largely academic, because the Government has not made a claim of procedural default in its opposition. (*See generally* Dkt. #481). A court "is not required to raise the issue of procedural default *sua sponte*," because "procedural default is normally a defense that the [Government] is obligated to raise and preserve if it is not to lose the right to assert the defense thereafter." *Trest* v. *Cain*, 522 U.S. 87, 89 (1997) (internal quotation marks and brackets omitted); *see also Cone* v. *Bell*, 556 U.S. 449, 486 n.6 (2009) (Alito, J. concurring) ("Unlike exhaustion, procedural default may be waived if it is not raised as a defense"); *cf. Jiau* v. *United States*, No. 11 Cr. 161-1 (JSR) (JCF), 2016 WL 11201437, at *5 (S.D.N.Y. Nov. 16, 2016) ("Rather, the Government is considered to have 'forfeited or waived the argument' when it fails to raise procedural default, leaving it to the court's discretion whether to raise the issue itself." (citations omitted)), *report and recommendation adopted*, 2018 WL 2122817 (S.D.N.Y. May 8, 2018). Accordingly, the Court proceeds to consider the merits of Mr. Serrano's argument.

### c.   Mr. Serrano's Conviction Under Section 924(c) Is Valid, Even After *Davis*

Ultimately, Mr. Serrano's *Davis* claim fails on the merits.  Mr. Serrano acknowledges that "[u]nadmitted offense conduct may serve as a predicate for a violation of § 924(c), but only so long as the record established that the additional conduct in fact occurred."  (Dkt. #472 at 12 (citing *Johnson* v. *United States*, 779 F.3d 125, 128-29 (2d Cir. 2015))).  He maintains, however, that the record is insufficient as to the additional predicate of narcotics trafficking, *i.e.*, Mr. Serrano's use of the firearm in furtherance of the Taylor Avenue Crew's narcotics trafficking.  (*Id.* at 13).  Not so, as this Opinion makes clear.  To begin, the Indictment to which Mr. Serrano pleaded guilty detailed a racketeering enterprise whose very *raison d'être* was the sale of crack cocaine in and around Taylor Avenue of the Bronx.  (Dkt. #73 at ¶¶ 1-6).  Acts of violence committed by Crew members were not indicative of a second, separate line of business, but rather were inextricably bound up in the Crew's narcotics trafficking.  (*Id.* at ¶ 5 ("Certain members and associates of the Taylor Avenue Crew committed and agreed, attempted, and threatened to commit acts of violence *to protect and expand their drug trafficking operation and to protect fellow members and associates of the Enterprise*." (emphasis added); *see also id.* at ¶ 32 (Count Fifteen)).

Mr. Serrano pleaded guilty pursuant to a Plea Agreement with the Government in which he specifically agreed to plead to a Section 924(c) charge that was predicated on two offenses, including, as relevant here, his use and possession of one or more firearms in furtherance of the charged narcotics

conspiracy. (Dkt. #472-1 at 30). During his plea allocution, Mr. Serrano was specifically advised (and acknowledged) that the Section 924(c) offense to which he was pleading guilty was predicated in part on the narcotics conspiracy. (Dkt. #121 at 14-15). And Mr. Serrano was allocuted at length concerning his involvement in selling cocaine, as well as his (and the Crew's) use of guns "to protect their territory or to aid them in continuing their operations." (*Id.* at 28; *see also id.* at 29 (admitting his use, carrying, or possession of a gun "in connection with [the Taylor Avenue Crew's] activities")). In short, abundant evidence in the record confirms not only Mr. Serrano's involvement in the charged narcotics conspiracy, but his use and possession of firearms in furtherance of that conspiracy.

In this regard, the Court is guided by the Second Circuit's analysis in *United States* v. *Dussard*, 967 F.3d 149, 156 (2d Cir. 2020). The defendant in *Dussard* had been involved in planning an armed robbery of a drug dealer; he was charged with conspiracy to commit Hobbs Act robbery, conspiracy to distribute narcotics, and possession of a gun during and in relation to a crime of violence and a drug trafficking crime. *Id.* at 151-52. Dussard agreed to plead guilty to the Hobbs Act conspiracy charge and the Section 924(c) charge (the latter of which was predicated on the Hobbs Act conspiracy charge), and the Government agreed to drop the narcotics distribution charge. *Id.* at 152. After *Davis* held that Hobbs Act robbery conspiracy was no longer a crime of violence for purposes of Section 924(c), defense counsel withdrew a previously

filed brief pursuant to *Anders* v. *California*, 386 U.S. 738 (1967), and argued on appeal for vacatur of the Section 924(c) count.  *Id.* at 154.

The Second Circuit reviewed Dussard's challenge for plain error, focusing in particular on whether the claimed error affected Dussard's substantial rights, which in the context of a conviction after a guilty plea required him to demonstrate that "there is a 'reasonable probability' that the error" in that case "affected the outcome of the proceeding."  967 F.3d at 156.  After reviewing the text of the indictment, Dussard's statements during the plea proceeding, the PSR's factual recitation (to which the defense had not objected), the benefits to Dussard in accepting a guilty plea that did not include a plea to a narcotics trafficking offense with a ten-year mandatory minimum term, and Dussard's statements accepting responsibility, the Second Circuit concluded that Dussard had failed to show that his plea of guilty to the Section 924(c) offense "adversely affected his substantial rights, given the record as a whole."  *Id.* at 156-57.

Among other things, the Court observed that Dussard "would have had little genuine hope of being acquitted of the ... drug trafficking conspiracy after a trial."  967 F.3d at 157.  The *Dussard* Court also noted that "nothing about [Dussard's] plea or the plea hearing itself provides any basis for an argument that he was willing to plead guilty to [the section 924(c) charge] only if it was tied to the charge of Hobbs Act conspiracy ... instead [of] the drug trafficking predicate," which has "no difference in the offense of conviction or in the punishment."  *Id.* at 158.  To the contrary, Dussard was "motivated — and the

government was willing — to enter into a plea agreement that would allow him to plead guilty to a § 924(c)(1)(A)(i) offense, with its mandatory minimum consecutive five-year prison term, plus an offense that had no mandatory minimum prison term," *id.*, rather than the ten-year mandatory minimum term specified by the narcotics count.  The Second Circuit thus affirmed the conviction, stating that the appellant "ha[d] not shown any reasonable probability that he would not have pleaded guilty to [the section 924(c) charge]" had *Davis* been in effect at that time.  *Id.* at 159.

As the Government observes (Dkt. #481 at 5), the record here is stronger than that in *Dussard.*  Where the Second Circuit had to search the record for proof of a qualifying predicate offense to which that defendant had not admitted, Mr. Serrano pleaded guilty to a dual-predicate Section 924(c) offense; he allocuted to both predicates; and the narcotics conspiracy predicate remains viable after *Davis.*  More than that, Mr. Serrano obtained several benefits from the Plea Agreement, including a plea to a lesser-included offense that did not involve the discharge of a firearm — even though Mr. Serrano freely admitted to "fir[ing] a gun through an apartment building" (Dkt. #121 at 27) — and dismissal of a narcotics charge that carried a ten-year mandatory minimum. *See Kilpatrick*, 2021 WL 3354737, at *3 (finding no plain error as to two defendants who pleaded guilty to Section 924(c) counts with crime of violence predicates, where record disclosed basis for narcotics offense predicates as to both, and where plea agreements were favorable to defendants); *United States* v. *Gomez*, 849 F. App'x 11, 12 (2d Cir. 2021) (summary order) (finding no plain

error where Section 924(c) conviction "just as easily could have been based on the drug trafficking charge," and where plea offer gave defendant "significant incentive to plead guilty").[10]

In his motion papers, Mr. Serrano argues a series of purported Rule 11 errors, suggesting that the dots were not properly connected between his admitted involvement in narcotics trafficking on behalf of the Taylor Avenue Crew and his admitted involvement in using a gun in furtherance of the Crew's activities. (*See, e.g.*, Dkt. #472 at 13-18 (alleging errors in plea proceeding); Dkt. #483 at 1-2 ("Also, while Mr. Serrano generally admitted that, as part of a pattern of racketeering, he agreed with others to participate in drug dealing, he never admitted that he used a gun in relation to that aspect of the affairs of the enterprise.")). As a factual matter, these efforts at hair-splitting are incorrect, given the Plea Agreement, the unobjected-to factual recitations of the PSR, and Mr. Serrano's own statements discussed above.[11] As a legal matter, Mr. Serrano's efforts to obtain vacatur through Rule 11 are unavailing:

---

[10]   Mr. Serrano's citations to Second Circuit decisions involving jury trials are inapposite. (*See* Dkt. #533, 590, 607, 609). In *United States* v. *Capers*, 20 F.4th 105 (2d Cir. 2021), and *United States* v. *Heyward*, 3 F.4th 75 (2d Cir. 2021), the Second Circuit found plain error in part because it could not be sure whether the jury's verdicts on the Section 924(c) counts rested on a proper or improper basis. In light of the *Dussard*, *Kilpatrick*, and *Gomez* decisions discussed in the text — which set forth a wholly different plain-error analysis for convictions obtained by guilty plea — Mr. Serrano is simply wrong to argue that "[a]lthough Mr. Serrano's § 924(c) conviction is based on his guilty plea instead of a jury's verdict, the same principles equally apply here." (Dkt. #590 at 1).

[11]   *See McKnight* v. *United States*, No. 15 Cr. 607 (JPC), 2021 WL 5647792, at *5 (S.D.N.Y. Dec. 1, 2021) (footnote omitted):

> Moreover, the factual basis to support a valid guilty plea need not only come from a defendant's allocution. *See* Fed. R. Crim. P. 11(b)(3) ("*Before entering judgment on a guilty plea*, the court must determine there is a factual basis for the plea." (emphasis added)). For instance, the Second Circuit has commented that the factual

> Where a Rule 11 challenge is brought in a motion under
> [28] U.S.C. § 2255, the "movant can successfully
> challenge [the] guilty plea conviction ... only by
> establishing that the violation constituted a
> constitutional or jurisdictional error, or by showing that
> the error resulted in a complete miscarriage of justice
> or in a proceeding inconsistent with the rudimentary
> demands of fair procedure." *Lucas* v. *United States*, 963
> F.2d 8, 12-13 (2d Cir. 1992) (internal quotations and
> citations omitted). The movant must also show
> prejudice, meaning that "he did not understand the
> consequences of his plea, or that, if he had been
> properly advised, he would not have pled guilty." *Id.* at
> 13.

*Rojas* v. *United States*, 803 F. App'x 526, 528 (2d Cir. 2020) (summary order);

*see also McKnight*, 2021 WL 5647792, at *4-5 (rejecting substantively identical

argument made by defendant in companion Leland Avenue case). Mr. Serrano

has made clear that he does not wish to withdraw his guilty plea, but only

wishes to be resentenced without the Section 924(c) charge. (Dkt. #483 at 2).

For all of the reasons just discussed, *Davis* does not support the relief he

seeks.

---

basis to support a plea may include "any other evidence ... in the record at the time of the plea," *Robinson*, 799 F.3d at 199-200, and has further explained that a district judge is not even "limited to considering the materials available at the time of the change of plea," but also may "look to 'the defendant's own admissions,' and to 'statements of the defendant, of the attorneys for the government and the defense, or of the presentence report when one is available,'" *United States* v. *Lloyd*, 901 F.3d 111, 123 (2d Cir. 2018) (quoting *United States* v. *Pattee*, 820 F.3d 496, 509 (2d Cir. 2016)). Here, statements by the Government and defense attorney at the guilty plea hearing and statements in the Presentence Investigation Report, whose factual findings McKnight did not object to and Judge Pauley expressly adopted, *see* Sentencing Tr. at 2, 14, further demonstrate that McKnight engaged in a conspiracy to distribute narcotics.

**B.**   **The Court Grants in Part Mr. Serrano's Compassionate Release Motion**

**1.**   **The Section 3582(c)(1)(A)(i) Motion**

While his Section 2255 motion was pending, Mr. Serrano filed a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), citing the conditions of his confinement during the COVID-19 pandemic, his positive achievements while incarcerated, and his plans for reentry.  (Dkt. #508, 524). The Government opposed the motion by letter brief dated May 13, 2021; it noted that Mr. Serrano's vaccinated status ameliorated the risks to his health from the coronavirus, and argued more broadly that Mr. Serrano presented a continuing danger to the community and that the relevant factors counseled against his early release.  (Dkt. #519).

By Order dated April 12, 2022, the Court sought additional information concerning Mr. Serrano from both sides.  (Dkt. #605).  Mr. Serrano filed a counseled supplemental submission on April 29, 2022, in which, among other things, he provided information concerning his conditions of confinement during the pandemic, a recent disciplinary proceeding, and the plans made by Mr. Serrano and his family for his reentry.  (*Id.*; *see also* Dkt. #607-1 (letter from Mr. Serrano)).  The Government filed a letter brief dated May 2, 2022, incorporating by reference its prior submissions.  (Dkt. #608).

**2.**   **Applicable Law**

Under 18 U.S.C. § 3582(c)(1)(A), as modified by the First Step Act, a court may reduce a defendant's sentence upon motion of the Director of the BOP, or upon motion of the defendant.  A defendant may move under

28

§ 3582(c)(1)(A) only after the defendant has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* The Court understands that Mr. Serrano's application to the Warden of his facility was denied. (Dkt. #508 at 2).

When considering an application under Section 3582(c)(1)(A)(i), a court may reduce a defendant's sentence only if it finds that "extraordinary and compelling reasons warrant such a reduction," and that "such a reduction is consistent with the applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i); *see generally United States* v. *Jones*, 17 F.4th 371, 374 (2d Cir. 2021) ("Thus, extraordinary and compelling reasons are necessary — but not sufficient — for a defendant to obtain relief under § 3582(c)(1)(A). As we have just noted, a district court must also consider 'the factors set forth in section 3553(a)' before granting relief." (citing 18 U.S.C. § 3582(c)(1)(A))). "The defendant has the burden to show he is entitled to a sentence reduction." *United States* v. *Ebbers*, No. 02 Cr. 1144-3 (VEC), 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020) (citing *United States* v. *Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992)).

The Second Circuit has summarized the standards pursuant to which district courts must evaluate compassionate release applications:

> Section 3582(c)(1)(A) authorizes a court to reduce a previously imposed term of imprisonment upon finding that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). A court

deciding a compassionate release motion can consider
"the full slate of extraordinary and compelling reasons
that an imprisoned person might bring before [it]."
*United States* v. *Brooker*, 976 F.3d 228, 237 (2d Cir.
2020).  But there are three requirements that must be
satisfied before a court can grant such relief.  First,
absent waiver or forfeiture by the government, an
inmate must exhaust administrative remedies by
requesting such relief from prison authorities.
Specifically, an inmate may ask the sentencing court to
consider reducing a sentence only "after the defendant
has fully exhausted all administrative rights to appeal a
failure of the Bureau of Prisons to bring a motion on the
defendant's behalf or the lapse of 30 days from the
receipt of such a request by the warden of the
defendant's facility, whichever is earlier."  18 U.S.C.
§ 3582(c)(1)(A); *see also United States* v. *Saladino*, 7
F.4th 120, 124 (2d Cir. 2021) (holding that the
government may waive or forfeit the exhaustion
requirement).  Second, a court must "consider[ ] the
factors set forth in [18 U.S.C. §] 3553(a) to the extent
that they are applicable."  18 U.S.C. § 3582(c)(1)(A); see
[*United States* v. *Jones*, 17 F.4th 371, 374-75 (2d Cir.
2021)].  Section 3553(a), in turn, lists numerous factors
a court must review when imposing a sentence.  These
include, as most relevant here, "the nature and
circumstances of the offense and the history and
characteristics of the defendant"; "the need for the
sentence imposed ... to reflect the seriousness of the
offense, to promote respect for the law, and to provide
just punishment for the offense"; "the need for the
sentence imposed ... to provide the defendant with ...
correctional treatment in the most effective manner";
and "the need to avoid unwarranted sentence
disparities among defendants with similar records who
have been found guilty of similar conduct."  18 U.S.C.
§ 3553(a).  Third, the inmate must demonstrate that his
proffered circumstances are indeed "extraordinary and
compelling" such that, in light of these § 3553(a)
factors, a sentence reduction is justified under § 3582(c)(1)(A)
and would not simply constitute second-guessing of the
sentence previously imposed.

*United States* v. *Keitt*, 21 F.4th 67, 71 (2d Cir. 2021); *accord United States* v.

*Halvon*, 26 F.4th 566, 570 (2d Cir. 2022); *see also United States* v. *Martinez*,

No. 06 Cr. 987-1 (DC), 2021 WL 3374530, at *2 (S.D.N.Y. Aug. 2, 2021)

(discussing what can qualify as "extraordinary and compelling reasons").  The

court's discretion includes both the power to reduce, and the power to

eliminate, the remaining term of a defendant's sentence.  *See Brooker*, 976 F.3d

at 237.

### 3.   Analysis

Mr. Serrano contracted the COVID-19 virus in or about December 2020

while housed at the United States Penitentiary in Pollock, Louisiana ("USP

Pollock").  (Dkt. #508 at 1).  In or about March 2021, he received both doses of

the COVID-19 vaccine.  (*Id.*).  In his initial compassionate release submission,

Mr. Serrano argued that this Court should recognize "that individuals, like Mr.

Serrano, who have medical conditions that potentially make them more

vulnerable to infection, still face extraordinary and compelling circumstances

while they remain in prison, even after they have contracted COVID and also

after they have been vaccinated."  (*Id.* at 3).  He further argued that the severity

of the conditions of his confinement — both in terms of lockdowns and reduced

opportunities for rehabilitative programming — counsel in favor of a reduction

in sentence.  (*Id.* at 4).  Finally, Mr. Serrano cited "his excellent programming

achievements in prison, his continuing family support, and his well developed

release plan."  (*Id.* at 5).  In his supplemental submission, Mr. Serrano

acknowledged that the number of positive COVID-19 cases had "substantially

declined" at FCI Ray Brook since his prior submission (Dkt. #607 at 2), but

noted that the facility was still operating as a "Level 3 Facility" with "intense

modifications," which included curtailments of social visits, time inmates may spend outside of their cells, and programming (*id.* at 2-3).

This Court acknowledges that courts in this District have granted, and denied, compassionate release motions predicated on the existence of the COVID-19 pandemic and the risks of its transmission in prisons. *See generally United States* v. *Morrison*, No. 16 Cr. 551-1 (KPF), 2020 WL 2555332, at *2 (S.D.N.Y. May 20, 2020) (collecting cases). This Court continues to align itself with those courts that have found "that the risks posed by the pandemic alone do not constitute extraordinary and compelling reasons for release, absent additional factors such as advanced age or serious underlying health conditions that place a defendant at greater risk of negative complications from the disease." *United States* v. *Nwankwo*, No. 12 Cr. 31 (VM), 2020 WL 2490044, at *1-2 (S.D.N.Y. May 14, 2020) (collecting cases).

Mr. Serrano has not made such a showing. Even were the Court to find that his asthma condition is "moderate or severe" — which is what the Centers for Disease Control and Prevention (the "CDC") states might increase an individual's chances of contracting severe illness from the COVID-19 virus — there are other factors to consider. *See* CDC, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (accessed May 5, 2022); *For People Living in Prisons and Jails*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/living-prisons-jails.html (accessed May 5,

2022).[12]  Among other things, Mr. Serrano's vaccinated status mitigates, though it does not reduce entirely, his risk of contracting the COVID-19 virus and having serious medical conditions, and it counsels against a finding of "extraordinary and compelling reasons."  *See United States* v. *Bailey*, No. 97 Cr. 269 (DLC), 2021 WL 4942954, at *2 (S.D.N.Y. Oct. 22, 2021) ("While the intersection of the COVID-19 pandemic and underlying health conditions can serve as an extraordinary and compelling circumstance justifying compassionate release, Bailey is fully vaccinated against COVID-19 and his medical records indicate that his chronic health conditions are well-controlled. Bailey's risk of continued incarceration given the COVID-19 pandemic does not qualify as an extraordinary and compelling circumstance.").[13]  Additionally, the Court takes notice of the BOP's report that FCI Ray Brook currently has no cases of COVID-19 among inmates and only four cases among staff.  *See* Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (accessed May 5, 2022).  On balance, this Court concludes that the danger that Mr. Serrano faces from infection with COVID-19, even accounting for his

---

[12]  *See also United States* v. *Jones*, 17 F.4th 371, 375 (2d Cir. 2021) ("While current guidance from the Centers for Disease Control and Prevention ('CDC') lists 'moderate-to-severe' asthma as a condition that 'can make [it] more likely' that a COVID-19 infection will result in severe illness, People with Moderate to Severe Asthma, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extraprecautions/asthma.html (updated Apr. 7, 2021), [Defendant] does not claim that he suffers from moderate or severe asthma, rather than a mild form of asthma.").

[13]  The Court takes note, however, of Mr. Serrano's statement that he has been unable to obtain a vaccine booster shot since his transfer to FCI Ray Brook, and expects that BOP officials will address this issue promptly.  (Dkt. #607 at 2).

asthma, does not amount to extraordinary and compelling reasons for granting compassionate release.

Mr. Serrano offers an additional basis for compassionate release that has more traction, namely, that the conditions of his confinement during the COVID-19 pandemic have resulted in a sentence that was more severe than the Court contemplated when it originally sentenced Mr. Serrano in January 2017. (*See, e.g.*, Dkt. #508 at 5 ("We hope this Court will again consider the 'more punishing' quality of Mr. Serrano's incarceration over the past 13 plus months and modify his sentence accordingly."); Dkt. #607 at 3 ("All of these modifications naturally have made the conditions of Mr. Serrano's confinement far harsher than could have been anticipated at the time of his sentencing, and after 25 months of these atypically severe restrictions and lock downs, some downward modification of his remaining sentence is justified.")).  The Court acknowledges that it could not have foreseen the restrictions that would be precipitated by the pandemic (including lockdowns and curtailment of facility programming and visitation opportunities), nor the public health risks faced by individuals like Mr. Serrano who spent the entirety of the pandemic in a carceral setting, nor the length of time over which these risks and deprivations would persist.  And in a prior decision resolving a compassionate release motion, the Court recognized "that courts reviewing motions for sentence modifications have considered the extent to which onerous lockdowns and restrictions imposed by correctional facilities attempting to control the spread of the virus have made sentences 'harsher and more punitive than would

34

otherwise have been the case.'"  *United States* v. *Hatcher*, No. 18 Cr. 454-10 (KPF), 2021 WL 1535310, at *3 (S.D.N.Y. Apr. 19, 2021) (quoting *United States* v. *Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020)); *see also United States* v. *Mcrae*, No. 17 Cr. 643, 2021 WL 142277, at *5 (S.D.N.Y. Jan. 15, 2021) ("[A] day spent in prison under extreme lockdown and in fear of contracting a deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While not intended as punishment, incarceration in such conditions is, unavoidably, more punishing.").  In short, the Court believes that pandemic-induced conditions of confinement *may* constitute "extraordinary and compelling" circumstances warranting compassionate release, particularly for defendants who have (i) served long sentences and (ii) been detained for the entirety of the pandemic.  It therefore proceeds to consider whether such relief is warranted in light of the factors set forth in 18 U.S.C. § 3553(a).

In this case, the Section 3553(a) factors — which include "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as the need "to protect the public from further crimes of the defendant" — point in both directions.  *See* 18 U.S.C. § 3553(a)(1), (a)(2)(C).  The instant case represented Mr. Serrano's sixth criminal conviction.  (PSR ¶¶ 101-105).  In this case, Mr. Serrano distributed crack cocaine for the Taylor Avenue Crew over a period of years, and both sold crack in the Bronx and transported it to Maryland for distribution.  (*Id.* at ¶¶ 9, 47-48; Dkt. #519 at 8).  On at least two occasions, Mr. Serrano resorted to using firearms to enforce the Crew's control over its territory, brandishing the firearm on one occasion and

firing it on another in a misguided (and thankfully unsuccessful) effort to murder a rival gang member. And during his period of incarceration, Mr. Serrano amassed several disciplinary violations, including citations for assault, possession of an unauthorized item, possession of narcotics, and destroying property. (Dkt. #519 at Ex. C).[14] As countervailing facts, the Court notes that Mr. Serrano has been detained on these charges since September 2015 (PSR at 2); that he has attempted to better himself in prison (Dkt. #508 at 5; Dkt. #607 at 3-4); and that he has proposed a plan of reentry (Dkt. #508 at 5; Dkt. #607 at 3-4; Dkt. #607-1). After balancing the severity of Mr. Serrano's criminal conduct with the severity of the conditions of his confinement, this Court will grant his request for compassionate release in part, by reducing his sentence by ten (10) months.

## CONCLUSION

For the reasons set forth in the remainder of this Opinion, the Court DENIES Mr. Serrano's motion pursuant to 28 U.S.C. § 2255 to vacate his conviction. A certificate of appealability shall be not granted, because Mr. Serrano has not made a substantial showing of a denial of a federal right and appellate review is, therefore, not warranted. *Hoffler* v. *Bezio*, 726 F.3d 144, 154 (2d Cir. 2013); *Tankleff* v. *Senkowski*, 135 F.3d 235, 241 (2d Cir. 1998).

Further, the Court GRANTS IN PART Mr. Serrano's motion for a reduction in sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), such that his

---

14    The Court accepts Mr. Serrano's representation that he is appealing a disciplinary sanction awarded in January 2022. (Dkt. #607 at 3-4).

sentence is modified to reduce the term of imprisonment on Count One from 78

to 68 months, still followed by a consecutive sentence of 60 months'

imprisonment on Count Fifteen.  This Court will further amend the judgment

pursuant to Fed. R. Crim. P. 36 to make clear that Mr. Serrano's conviction on

Count Fifteen is predicated on a qualifying narcotics trafficking offense.  All

other aspects of Mr. Serrano's sentence remain in full force and effect.

The Clerk of Court is directed to docket this Opinion in Case Nos. 15 Cr.

608-4 and 20 Civ. 9887; to terminate all pending motions in both cases; and to

close Case No. 20 Civ. 9887.

Dated:      May 6, 2022
            New York, New York

                                        _____
                                          KATHERINE POLK FAILLA
                                          United States District Judge